338    LICKING COUNTY COMMON PLEAS.

Minor v. Shipley et al.          I Vol. 24 (N.S.).

## DETERMINATION AS TO WHETHER TITLE]WAS ACQUIRED BY PURCHASE OR DESCENT.

Common Pleas Court of Licking County.

ARREL GILFORD MINOR v. GEORGE N. SHIPLEY ET AL.*

Decided January Term, 1922.

*Action to Quiet Title—Proceeds of Farm Bequeathed to Daughter and a Benevolent Society—Daughter Remains in Exclusive Enjoyment for More Than Twenty-one Years—Suit by the Society for a Receiver—Daughter Claims Title for Non-User—Ineffective Decree in Her Favor—Attempt by Society to Sell Notwithstanding Lack of Authority—Question of Forfeiture—Effect of Quit Claim Deed—Character of Present Title in the Land.*

A testator bequeathed a portion of the proceeds of his farm to his daughter and the remainder to the Preachers Aid Society, the proceeds to all go to the society at the death of the daughter but without power to sell the farm. After twenty-nine years of exclusive enjoyment of the farm by the daughter, the society brought suit for a receiver and its share of the proceeds. The daughter claimed title had reverted to her by non-user, and she was given judgment with costs. A few days prior thereto she had obtained a quit claim deed from the society for a consideration of $500. Twenty-seven years later she died in possession of the farm and without issue. If her title was acquired by descent, her husband takes a life estate; if by purchase, a title in fee simple. *Held*:

1. It was impossible that the society could, during the life time of the daughter, have forfeited by non-user its vested remainder which did not ripen until the death of the daughter. The decree obtained by her was therefore without effect.

2. The attempt by the society to sell its interest in the farm did not work a forfeiture of its rights therein, in view of its want of authority to consumate a sale; but its quit claim deed became effective at the time of its execution as an estoppel against the society claiming its vested remainder at the death of the daughter, and title ripened in the daughter by reason of her holding the land adversely to the society for more than twenty-one years after execution of the quit claim deed. The daughter's title was therefore a title by purchase.

* Affirmed by the Court of Appeals.

*E. S. Randolph,* for plaintiff.

*Swartz, McNamar & Glauner* and *Flory & Flory,* for defendants.

MOORE, J. (Orally).

The plaintiff in this case seeks to have his title quieted in certain lands situated in Hanover township, Licking county, Ohio.

Plaintiff claims in his petition that he is the owner in fee simple of said real estate. There are a number of defendants, some of whom have filed answers. The facts upon which plaintiff's title and possession are based are as follows:

John Enyart, who died in the year 1853, was, at the time of his death, the owner in fee simple of the lands in controversy. The said Enyart died testate and his will was duly probated in the Probate Court, Licking county, Ohio. Afterwards, in 1879, the said will was re-probated by a proceeding in this court, the original record of the probate court having been destroyed by fire in 1873. There are three items in this will which read as follows:

"Item 2. I give to my wife, Anna, all the proceeds of my farm on which I now reside in Licking county, Ohio, until my daughter Maria shall arrive at the age of eighteen years."

"Item 3. When my said daughter shall arrive at the age of eighteen years then she shall have one-fourth of the proceeds of said farm, my wife one-fourth so long as she remains my widow, and the remainder shall go to the Preachers' Aid Society of the Methodist Protestant Church and the Muskingum Annual Conference."

"Item 4. At the death of my said daughter I give the whole of said proceeds of said farm to the Preachers' Aid Society, but said Society are not to sell the farm."

In 1864 Anna Enyart, the wife of said John Enyart, died. On April 11, 1893, the Preachers' Aid Society filed a petition in this court against Maria Minor, the said daughter mentioned in said will. This petition, after setting forth the provisions of the will of John Enyart, alleges that plaintiff is entitled to a part of the proceeds of the farm; that plaintiff is a tenant in common with defendant; that the parties are unable to agree upon the

340 LICKING COUNTY COMMON PLEAS.

Minor v. Shipley et al.                        Vol. 24 (N.S.)

proper management and repair of the farm, and alleges other, perhaps immaterial, allegations. A copy of the Enyart will is attached to the petition. The prayer of this petition is as follows:

"Wherefore said plaintiff prays that a receiver may be appointed to take charge of said farm, put it in proper repair, rent and manage the same, and divide the proceeds of said farm between the said plaintiff and the said defendant according to the terms of said will, and for all other relief to which the said plaintiff is in equity entitled."

Defendant filed an amended answer to this petition, in which she sets up five defenses. One defense is, in effect, a general denial. Three of the defenses plead, respectively, the twenty-one-year, the six-year and four-year statutes of limitation. This answer also contains this allegation:

"And for a second defense this defendant represents that she was at the time of the death of the said John Enyart, the testator, and still is, his only heir at law, and the sole owner of the real estate of which he died seized set out and described in plaintiff's petition, and she is in the exclusive possession and enjoyment thereof and has been ever since the death of her mother, the said Anna Enyart, on the 10th day of April, 1864, claiming title thereto in fee simple and in her own right, and, for more than twenty-one years next preceding the commencement of this action, she has been such owner in the open, notorious and exclusive possession of said real estate."

This answer asks no affirmative relief. The final journal entry reads as follows:

"This cause of action came on this day to be heard, was submitted to the court upon the pleadings and the evidence and on consideration thereof the court finds on the issues joined for the defendant. It is therefor considered by the court that the defendant, Maria E. Minor, go hence *with the* day and recover from the plaintiff, the Preachers' Aid Society of the Methodist Protestant Church of the Muskingum Annual Conference, her costs herein expended, and that the plaintiff pay its own costs, and in default of such payment that execution issue therefor."

The date of this entry is September 27, 1894.

On September 24, 1894, three days before the date of this entry, the Preachers' Aid Society executed and delivered a quit claim deed to Maria Minor, the defendant, releasing, or attempting to release, the interest of said society in said real estate. This deed recites a consideration of $550. It is recorded in Volume 157, page 571 of the deed records of this county.

Maria Minor died in 1921, leaving a husband, the plaintiff herein, and no children.

The sole question to be determined in this case is whether the said Maria Minor acquired title to said real estate by descent or by purchase. If by descent, the plaintiff takes a life estate in the land. If by purchase, he takes a fee simple.

It seems to be conceded by all the counsel in this case that the will of John Enyart passed title, or an interest of some kind, in this real estate, to the Preachers' Aid Society.

Counsel for one of the defendants urges that the decree of the court was an adjudication that Maria Minor owned the real estate in fee simple as heir at law of John Enyart; that by this adjudication the title became a title by descent.

Counsel for other defendants urge that the limitation contained in John Enyart's will against the sale of the real estate was valid, and thereby the quit claim deed was a mere nullity; that prior to the date of the deed, and prior to the decree of the court the Preachers' Aid Society had forfeited their title by non-user, and the same had reverted to the heir at law of John Enyart, and her title thereby became a title by descent.

Manifestly, this contention can not be sustained for several reasons, among which are: By the terms of the will the Preachers' Aid Society did not come into possession of all the proceeds of this farm, in other words, of the remainder, until the death of the daughter, which occurred some twenty-eight years after the time when it is claimed the title reverted to her by non-user. The mere statement of the proposition that a vested remainder, to which there is no right of possession until the happening of a specified event, is forfeited by non-user before such event takes place, is sufficient to dispose of this claim. Forfeitures are not

favored in law any more than in equity, but must be strictly construed.

The entire proceeds of this farm are given to the Preachers' Aid Society generally, by words which, in a will, pass a fee simple title in the land itself.   There is no limitation to any particular use imposed upon the Preachers' Aid Society. The limitation, if any, would have to be implied from the character of the society itself.   To work a forfeiture in a case of his kind there must be clear proof of a failure of the use as contained in the grant.   Under the construction claimed, every abandoned church property would revert to the original grantor, or his heirs. There is no difference in the tenure of this property and all other property in Ohio, held by a corporation not for profit, except the possible limitation that said society shall never sell the farm.   Even assuming, as the name indicates, and concerning which there is no proof before the court, that this society is a charitable society, and a part of the system and management of the Methodist Protestant Church, the statutes of Ohio provide for the sale of abandoned church property, and such property does not revert, unless the grant to such church clearly expresses or clearly implies such reversion. The mere fact that the society attempted a sale, which it had no right to consummate, could not in itself cause a reversion, unless the grant, or instrument by which it took title, so provided.

As to the matter of the adjudication in the case of the Preachers' Aid Society against Maria Minor: this was an action for the appointment of a receiver and an accounting.

The doctrine of res adjudicata in Ohio, is, briefly, that a judgment is conclusive not only as to the matters actually determined but also as to every other matter which might have been litigated and decided upon the issues made in the case, and upon which it was tried. Roby v. Rainsberger, 27 O. S., 674.

What were the issues made in this case, and upon which it was tried? This court is of the opinion that the issue of whether or not Maria Minor was the owner in fee simple, as heir at law of her father, was not made, nor tried in this case.   An examina-

tion of the pleadings of the case clearly settle this, in the judgment of this court. If Maria Minor has filed a cross petition in the case against the plaintiff and had asked the court to quiet her title for the reason that she held as heir, she could have made this fact an issue, possibly, but under the pleadings as filed, and upon which the case was tried, no such issue was made, that it is thereby *res adjudicata*. So far as this adjudication alone goes, the matter of the title of this farm could have been litigated at the time of the death of Maria Minor in 1921. The only issue that could have been tried upon the pleadings, as filed, was the right of the Preachers' Aid Society to an accounting.

This court is of the opinion that the limitation in a grant to a charitable institution upon the right to sell· is valid; that the attempted sale did not work a forfeiture; that the adjudication in the law suit between the Preachers' Aid Society and Maria Minor did not adjudicate the question of the ownership of· the land, and that the same could not have been adjudicated upon the issues raised by the pleadings in the case. The quit claim deed from the society to Maria Minor did not convey title, but it became effective at the time of its execution as an estoppel against the society claiming its vested remainder at the death of the grantee; but this, in the judgment of the court did not, in itself, make the title revert to Maria Minor. The grantee held the land continuously for a period of some twenty-eight years after the execution of this deed, and the deed is conclusive evidence of her holding the same adversely to the society, and the title of Maria Minor thereby ripened into a perfect legal title in twenty-one years from the date of the execution of the deed, and was a title by purchase.

Judgment for plaintiff; title may be quieted against the defendants.

## SUPPLEMENTAL OPINION.

The attention of the court has been called in this case to the third defense in the answer in the case of the *Preachers' Aid Society* v. *Maria Minor*. It is claimed that this defense raises the

issue as to whether or not Maria Minor was the heir at law of John Enyart and held title as such heir at law to the real estate in question. This defense reads as follows:

Third Defense: And for a third defense this defendant says the plaintiff's action is barred by the statute of limitations of twenty-one years, as hereinbefore stated in her second defense, and she prays judgment accordingly, and that she be quieted in her said title.

Applying the principle of *res adjudicata*, as stated by the court in its former opinion, the court is of the opinion that this defense does not raise the issue of whether or not Maria Minor was the owner in fee simple as the heir of her father, but that it only raises the issue of whether or not plaintiff's action is barred by the statute of limitation, and the case was therefore tried and litigated upon issues from which, as made, it could not have been determined whether or not Maria Minor was the owner of this land in fee simple as the heir of her father.

There may be a judgment as heretofore indicated.

## IMPLIED WAIVER BY SELLER OF TERMS OF SALE.

Common Pleas Court of Montgomery County.

THE BIGGS-WATTERSON COMPANY v. JOHN EDWARD SAUER AS
RECEIVER OF THE DAIRY ENGINEERING COMPANY.*

Decided, 1922.

*Sales—Presumption as to Payment—Machinery Sold and Put Into Use
Without Demand that Settlement be Made—Action in Replevin
Against Assignee of the Purchaser.*

Where machinery is sold for one-third cash with ninety days accept-
ance for the balance, and no demand for settlement is made for
three months after delivery and placing of it in use by the pur-
chaser, the rescinding of the contract of sale by the seller does not
afford a basis for an action in replevin by the seller against the re-
ceiver of the purchaser, but the transaction will be treated as one
where there was an extension of credit with the title vested in the
seller.

SNEDIKER, J.

This case is in replevin. The plaintiff claims that it is en-
titled to recover possession of a certain lathe and equipment
which it sold to the Dairy Engineering Company, of which the
defendant is now the receiver, and it claims that the property
is being wrongfully detained by the defendant from it.  The
defendant filed an answer in which he denies that he wrongfully
detains the property described in the petition of the plaintiff, and
denies that the plaintiff is its owner, or entitled to the possession
thereof.

There were examined but three witnesses, M. A. Wertman,
who at the time of the purchase of the lathe by the Dairy Engi-
neering Company from the plaintiff was the agent of plaintiff,
which is a Cleveland corporation and had offices in this city;
R. W. Cavanaugh, who is secretary and treasurer of the plain-
tiff, and whose place of business is in the office of plaintiff in
Cleveland, and J. Edward Sauer, the defendant, on cross-exami-
nation,—all for the plaintiff.

When the plaintiff closed its case, the defendant offered no
evidence, and the case rested on both sides.  It appears in proof
that on September 11, 1919, an order (Exhibit B) was sent by
the Dairy Engineering Company to plaintiff, in these words:

---

*Affirmed by Court of Appeals on the reasoning herein contained.

"Kindly enter our order for one 16 inch x 7 feet 0 inches Chard Quick Change Gear Engine Lathe with double back gears, arranged for motor drive, electric control in the apron.

"Multiple cross feed stop.

"Multiple length feed stop.

"Patented friction lever movement on the tail stock.

"Terms of payment to be arranged as suggested in your letter of the 10th inst., namely, one-third cash on delivery, balance on a three months trade acceptance note, with privilege of renewing one half at the end of three months.

"Note to carry 6 per cent. interest and secured by acceptable endorsement.

"We have made arrangements with the Fairbanks-Morse Co. to ship the motor direct to the Chard Co. with all the necessary information they may need.

"Trusting that we may have a quick delivery on this machine, we remain, Yours truly."

On September 15th, 1919, this order was accepted, as follows:

"We have your order of September 11th, covering one 16 inch x 7 feet Chard Quick Change Gear Engine Lathe arranged for motor drive, with apron control, multiple cross feed stop, multiple length feed stop and quick acting tail stock.

"Price f. o. b. Newcastle, Indiana ...........$1,390.00

"Terms of payment to be one-third cash on delivery, balance covered by three months trade acceptance to carry interest at 6 per cent.

"We note that you have made arrangements with the Fairbanks-Morse Company to have your motor shipped direct to the Chard Lathe Company and have entered your order for shipment of the lathe within two weks after receipt of complete motor equipment.

"We will forward trade acceptance with invoice as soon as the lathe has been shipped.

"Thanking you for your ordr, we are,
        "Yours very truly."

On December 15th, invoice of the lathe was sent by the Biggs-Watterson Company to the Engineering Company as follows:

                "Cleveland, Ohio, December 15th, 1919.
    "Sold to the Dairy Enginering Co.
    "Dayton, Ohio.
    "Terms one-third cash; balance 90 day trade acceptance with 6 per cent. interest."

Here follows a statement of the lathe and its parts.

"Price, f. o. b. Newcastle, Indiana, $1,390.00. Shipped from Chard Lathe Co. via Big Four Railroad, in Erie Car, etc."

The lathe was received by the Engineering Company, which failed to the time of the bringing of this action to make settlement. It does not appear from the evidence that either the cash was paid or the trade acceptance was made and delivered to the plaintiff. About January 12, 1920, Mr. Wertman, the local agent of the Biggs-Waterson Company, left the city and went to the home office there to rmain. On cross-examiination of Mr. Cavanaugh, he testified:

"Q. After these goods were shipped, and in the ordinary course of human events, the goods would have been deliverd to the Dairy Engineering Company, some time in the month of December, 1919? A. Yes, siir.

"Q. During the entire month of January you never sent them a bill? A. No, sir.

"Q. And during the month of February? A. No, sir.

"During the month of March? A. No, sir.

"Q. There was no effort made by your company to collect the cash payment that was due until the receiver had been appointed in the common pleas court of this county? A. No, sir.

"Q. What efforts did you make with reference to the Dairy Engineering Company to collect the money? A. Not direct; through the Dayton office.

"Q. Not what your Dayton office did or what took place between you and the Dayton office. I want to find out what was brought to the attention of the Dairy Engineering Company. Did you send any communication or make any demand upon the Dairy Engineering Company, during the month of January for the cash payment when it was not paid? A. Not direct.

"Q. Did you make any demaand during the month of February from your office? A. Not direct.

"Q. Did you during the month of March prior to the appointment of the receiver? A. Not direct.

"Q. The first action that was taken in the matter was after the receiver had been appointed some time in the month of March, wasn't it? A. It was during March.

"Q. You directed your local office at Dayton, Ohio, to get in touch or in communication with attorneys and start proceedings? A. Yes, sir.

"Q. That was the first action that was taken by your company in regard to the transaction as far as you know? A. Directly, yes, sir."

When Mr. Wertman was cross-examined, in answer to the question, "Q. Did you not have any negotiations or any dealings or any conversation with anybody connected with the Dairy Engineering Company in regard to this transaction after the 12th day of January, 1920?" his answer was, "I did not." "Q. All the transactions you have had between you and the Dairy Engineering Company is embodied in this correspondence-    A. Yes, sir."

The evidence does not disclose any demand made upon the Engineering Company between the date of plaintiff's invoice and March 3, 1920, when its counsel wrote the Dairy Engineering Company as follows:

"Our Mr. Murphy telephoned your Mr. Young yesterday in reference to the claim of $1,462.53 in favor of the Biggs-Watterson Company of Cleveland. We have instructions to proceed against you in this matter and we must insist that you call and arrange for the settlement, otherwise we will be compelled to follow instructions."

We understand that on the following day Mr. Sauer was appointed receiver of the Engineering Company, and on that same day there was sent to him a letter of the Biggs-Watterson Company signed by its attorneys to the effect that "This is to notify you that the undersigned hereby rescinds sales made to the Dairy Engineering Company on certain machines under invoices of December 15th, 18th and 22d, 1919." It may here be interpolated that the sale of the 18th and 22d were of minor parts.

After sending this notice of rescinder the plaintiff began its case to recover possession of this lathe and these parts, on the theory that it was entitled thereto at the commencement of this action for the reason that the sales made to the Engineering Company were for cash, and that it was contemplated that there should be made a payment for the articles delivered at the time they came into the hands of the Engineering Company, which payment was not made.

It will be observed that in this evidence plaintiff makes no charge of fraud against the Engineering Company in obtaining credit.

The question which is here raised has been before the Supreme Court of Ohio at different times and beginning with the 23 O. S.,

page 311, the case of *Wabash Elevator Company* v. *First National Bank of Toledo,* we find this rule laid down in the syllabus:

1.  "Where one agrees to sell and another to buy articles at a specified price, and there is no other stipulation as to payment, it is presumed to be a cash sale, and the delivery of the goods and payment of the price are to be simultaneous, and concurrent acts."

2.  "The delivery of the goods on such sale, with the expectation of receiving. immediate payment, is not an absolute delivery, and no title vests in the purchaser till the price is paid."

· Again in the 33 O. S., at p. 63, in the case of *Hodgson* v. *Barrett,* the syllabi read:

1.  "In the caase of an assignment by an insolvent debtor for the benefit of creditors, the rights of the assignee in. the property assigned are no greater than those of the debtor prior to the assignment.

2.  "Where goods are sold for cash, delivery and payment are concurrent conditions of the sale; and, a delivery made in expectation of immediate payment is conditional only; so that if payment be refused, the vendor may reclaim the goods."

· Subsequent to the case in 33 O. S., there was before the Circuit Court of Hamilton County, (Judges, Cox, Smith and Swing) a case of like chaaracter (1 O. C. C., p. 453) in which it was held in the first syllabus:

"Although it is clearly the law, that on a contract of sale of articles at a specified price, and there is no other stipulation as to payment, it is presumed to be a cash sale, and the delivery of the goods, and payment of the price are to be simultaneous and concurrent acts; and the delivery of the goods on such sale with the expectation of an immediate payment, is not an absolute delivery and no title vests in the purchaser till the price is paid. yet the seller may either expressly or impliedly *waive* this right, to immediate payment, in which case the title will pass to the purchaser."

Judge Smith rendered the opinion in this case, and in discussing the law he says:

It is conceded that Edwards, under his original contract, was entitled to demand payment for the tobacco, before any right to it would pass to Glancy. If he had actually turned it over to him, expecting immediate payment, and it was not made, he was at liberty to repossess himself of it, and Glancy would have had

no right to it. The doctrine of the law on this point is stated very strongly in 23 O. S., 311, the syllabus of which is as follows:'' (Here the Judge quotes the syllabi which we have here-tofore referred to.)

''But it is obvious that the language used in the second syllabus is not to be understood in the broadest sense—that is, that under *no* circumstances will the title vest in the purchaser, when a delivery of goods is made, with an expectation of receiving immediate payment, till the price is paid. Such a construction of it would operate to prevent any subsequent arrangement between the parties that the title would overturn the well-established doctrine, that a condition in favor of one party to a contract, may be waived by him, either expressly, or that such a waiver may be implied from his conduct. Indeed, in the very case referred to, the judge, in delivering the opinion of the court, states the doctrine of the law, with the proper qualification, which, however, is left out of the syllabus. He says, 'A delivery with the expectation of receiving immediate payment, is not absolute but conditional, until payment is made, *and where there is no waiver of payment, no title vests* in the purchaser till the price is paid, citing many authorities, and adds, 'in this case there was no waiver.'

''In the case of *Hodgson* v. *Barrett*, 33 O. S., 63, also cited by the plaintiff in error, and which affirms the general doctrine of the case of 23 O. S., the court to some extent recognizes the doctrine, that the seller may waive a condition of this kind, and the title pass to the purchaser without payment. Judge Scott says, 'for some unexplained reason, the cash payment was not made until the next day' (after delivery), 'but we can not infer from the mere fact that a night intervened before the cash payment was made, that the plaintiffs consented to waive their right to require present payment, or to secure possession of the barge and its cargo if payment should be refused. Such temporary delay is quite consistent with the idea that the parties intended their respective rights to remain *in statu quo*, until payment is made.' And in the syllabus of that case it was held, 'that the giving of a check therefor, which when presented for payment is dishonored, will not prevent the vendor from retaking the property, though the check was not presented for four days, if the drawer had no funds in the hands of the drawee to meet it, and no injury has resulted to the drawer from the delay.' ''

''That there may be a waiver of this kind, is clear on principle and authority. There can certainly be no good reason why it might not be done, and the books are full of cases in which the courts have held that it may. In Benjamin on Sales, note *d* to section 320, the rule is thus stated: 'When there is a condition

precedent attached to a contract of sale and delivery, the property does not vest in the purchaser on delivery, nor until he performs the condition, or the seller waives it,' and a multitude of authorities are cited in support of the rule.

"What will constitute a waiver in such case? Chancellor Kent in the second volume of his Commentaries, states the law thus: 'If he (the seller) does deliver freely and absolutely, and without any fraudulent contrivance on the part of the vendee to obtain possession and without exacting or expecting simultaneous payment, there are a confidence and credit bestowed, and the precedent condition of payment is waived, and the right to property passes.' * * * 'If it was even a condition of the contract that the seller was to receive a note or security for payment at another time, he may dispense with that condition, and it will be deemed waived by a voluntary and absolute delivery without a concurrent demand of the security. But if the delivery in that case be accompanied with a declaration on the part of the seller, that he should not consider the goods as sold until the security be given, or if that be the implied understanding of the parties, the sale is conditional; and the property does not pass by the delivery, as between the original parties, though as to subsequent *bona fide* purchasers or creditors of the vendee the conclusion might be diffrent.'

"The cases cited in the brief of counsel for defndant in error, viz., 106 Mass., 422-7; 111 Mass., 487-9; 115 Mass., 514, 533; 111 Mass., 309 and 13 Pa. St., 146, and many others that might be named, abundantly sustain this doctrine, and we see nothing in conflict with it."

In the case of *B. & O. S. W. Ry. Co.* v. *Good et al,* 82 O. S., p. 278, Judge Summers says in the opinion: "The payment as a condition may be waived by the seller, and if it is, the property vests in the buyer."

And in the approved syllabus in this case we find this language: "In sales of specific chattels for cash on delivery, delivery and payment are concurrent acts, and delivery in expectation of receiving immediate payment is not absolute, but conditional, and *when there is no waiver of payment* the property does not pass until the price is paid."

In the Circuit Court case just quoted from a waiver was held to have occurred when there was nothing which tended to show any claim on the part of the seller that he was the owner of the property in question, from the second day of April to the fifth day of May, same year.

In the case at bar there is no evidence showing such claim on the part of plaintiff from the 15th day of December, 1919, the date when the lathe was shipped, f. o. b. Newcastle, Indiana, to the 4th day of March, 1920. Nor does it appear from the record that the failure of the plaintiff to so exercise its right, if it had been such right, was without knowledge of its privilege. From all the conditions such failure must be construed to have been intentional.

In his work on the law governing sales of goods at common law and under the uniform sales act, Williston at p. 557, in discussing a transaction similar to that with which we are here concerned, comes to this conclusion from all the authorities:

" * * * Accordingly, if after bargaining for a cash sale the seller subsequently, voluntarily, delivers to the buyer the goods with the intent that the buyer may immediately use them as his own, and without insisting upon contemporaneous payment, this action is absolutely inconsistent with the original bargain. Such a delivery is not only evidence of the waiver of the condition of cash payment, it should be conclusive evidence. Even though the case warrants the conclusion that the buyer and seller agreed or understood that the seller should not part with his title until the price was paid, it is still true that the delivery and permission to the buyer to use the goods as his own and inconsistent with the theory of a cash sale. Instead, a conditional sale has been substituted, and the transaction should be dealt with according to the rules governing conditional sales."

We think counsel will concede that the conclusion may fairly be drawn from the evidence before the court that this proprty was delivered to the Engineering Company by the plaintiff with the intent that the Engineering Company might immediately use it as its own. When the lathe was put on the cars at Newcastle, Indiana, f. o. b. it was then delivered to the Engineering Company. Subsequently, if it was used in the business of the company, and no claim was made from the date of such delivery to the time which we have before specified, the conclusion may fairly be drawn that the buyer was intended to immediately and continuously during that period use it in its business.

Section 8426 of the General Code provides:

"When, in pursuance of a contract to sell, or a sale, the seller is authorized or required to send goods to the buyer, delivery of the goods to a carrier, whether named by the buyer or not,

for the purpose of transmission to the buyer is deemed to be a delivery of the goods to the buyer, except as provided in Section 8399, Rule 5, unless a contrary intent appears."

8391, Rule 5, does not apply to a sale like the one we are discussing.

In support of the position taken by Williston, a number of authorities may be quoted. In the case of *Frech* v. *Lewis, Appellant*, 218 Pa. St., p. 141, the syllabus is:

1. "Where a contract of sale provides for payment of the purchaese price on delivery of the articles sold, and the seller delivers the goods but the buyer fails to pay, the right of property does not pass to the buyer with the possession, but remains with the seller, who may at his option reclaim the goods. The right to reclaim the goods, however, must follow the buyer's default as promptly as the situation of the parties and the circumstances of the case will allow.

2. "In such a case reliance upon a subsequent promise to pay that leads the seller to refrain from asserting his rights to retake the property, is in itself a waiver of the right, and makes absolute a delivery which in the first instance was conditional. The seller's only remedy is against the buyer as a debtor.

3. "Fraud and artifice practiced by the buyer may excuse delay in attempting a recovery of property after delivery, but not mistaken confidence in the buyer's promises."

In the opinion Justice Stewart says:

"This does not mean that the seller must *eo instanti* begin legal proceedings to recover the goods; but it does mean that the seller when he discovers that his delivery is not followed by payment as he had the right to expect, is at once put to his election whether he will waive the condition as to the payment and allow the delivery to become absolute, or retake the property, and that he is to allow no unnecessary delay in making his choice. The object of the law is not to multiply his remedies because of his disappointment. He may not continue to hold his right to the goods, and at the same time hold the buyer as his creditor; one or the other he must relinquish, and do it promptly, or the law will forfeit his right to elect. Continued acquiescence in the buyer's possession of the goods will be taken as a choice on his part to regard the delivery as absolute, notwithstanding the buyer's default. The policy of the law, in requiring promptitude in the assertion of continued ownership of the goods, could easily be vindicated were it necessary. It answers every purpose here to show that the law requires it."

Further along in the opinion the justice quotes *Backentoss* v. *Speicher,* 31 Pa. St. 324.

"A sale of goods for cash is, strictly speaking, a sale on condition. The contract is *do ut des.* The condition is more imperative than such as was in this case, but for that reason less easily waived; and yet, if the vendor acquiesced in a possession obtained in disregard of the condition, he waives it; and though he may recover the price by action, he can not recover the goods in specie. When the plaintiff found his condition disregarded, he should have promptly reclaimed the goods."

In discussing the question as to what constitutes reasonable time in which a plaintiff under such a state of facts should act, the Justice says:

"By reasonable time is to be understood such promptitude as the situation of the parties and the circumstances of the case will allow. It never means an indulgence in unnecessary delay, or in a delay occasioned by the vain hope and fruitless effort to obtain the money from the defaulting buyer. When the delay is to be accounted for by the latter consideration, it is accepted as an acquiescence in the delivery and the acceptance of the buyer as a debtor."

In the case of *L. C. Smith & Bros. Typewriter Co., Appellant,* v. *Luebkman, Respondent,* 147 Wis. Rep., p. 317, the syllabi are as follows:

1. "Upon failure of the purchaser to make an agreed cash payment the vendor's right to retake the goods sold must be asserted without unnecessary delay or will be deemed to have been waived.

2. "By a delay of forty-five days after receiving notice of non-payment of a check given for an agreed cash payment on a typewriter, before taking any steps to reclaim the property, the vendor waived the condition as to the cash payment and permitted the delivery to become absolute."

In the 111 Mass., in the case of *Upton* v. *Sturbridge Cotton Mills,* Judge Wells says:

"Delivery as applied to a change of possession in pursuance of a sale, ordinarily includes both the act of the vendor in transferring the property and that of the vendee in receiving it. If unaccompanied by any word or act or circumstance to indicate that it is qualified, or made subject to a condition, the ven-

dee has a right to understand it is to be absolute. To hold him accountable as custodian of the property belonging to another, requires his assent to the obuligation, either express or by implication. If there has been completed delivery the denial of a waiver involves necessarily the affirmative proposition that the other party to the delivery has accepted the possession subject to the condition. The reciprocal relations of the parties are the same as in all matters of contract."

There is nothing disclosed in the evidence before us to the effect that the Engineering Company in so many words, accepted the possession of the lathe subject to the condition that it was to remain the property of the plaintiff. The reliance of the plaintiff is upon the general rule of the common law with respect to cash sales. The provisions of the Code with respect to sales, which may be said to be arbitrary and controlling in all things with regard to which they afford legislation, are, as found at Section 8436: "The unpaid seller of goods looses his lien thereon—(a) When he delivers goods to a carrier or other bailee for the purpose of transmission to the buyer without reserving the property in the goods or the right to the possession thereof; (b) When the buyer or his agent lawfully obtains possession of the goods; (c) By waiver thereof."

Of course, in the hands of the receiver, the property of the Engineering Company is held under the same obligations as before his appointment. But in view of the authorities quoted, we find the obligation which the Engineering Company owned to plaintiff at the date of the appointment of the receiver was that of debtor to creditor. We are, therefore, unable to find that at the commencement of this action the plaintiff was entitled to the possession of the chattels mentioned in the affidavit.

## ON MOTION FOR REHEARING

Some months ago, after a consideration of the evidence and the briefs of counsel, the court passed upon the merits of this case adversely to the claims of the plaintiff. Since that time there has been an application for a re-hearing and counsel were given the privilege of filing supplemental briefs and of re-arguing the case.

It is unnecessary for us to again recite the facts which were proven at the trial.

In the opinion rendered after the original hearing we made reference to the conduct on the part of the plaintiff which, we thought, amounted to a waiver, and applied to that condition the law as we understood it to be. Counsel for the plaintiff now contend that no waiver ought to be regarded by the court, for the reason that it is not pleaded by the defendant.

This is an action in replevin. The gist of the action is the claimed wrongful detention by the defendant against the plaintiff.

''The usual rule that under a general denial (and in this case a general denial was interposed by the defendant) the simple inquiry is, has the plaintiff proved his allegations and that nothing can be shown under it not tending to disprove them does not apply in replevin under the code, but as in the action of ejectment and in part for the same reasons the general denial not only puts in issue every material allegation of the petition but will sustain evidence of any special matter amounting to a defense and will support affirmative relief of return of the goods and damages in favor of the defendant and hence is the only answer needed.'' 3d Bates Pleading and Practice, p. 2580.

This rule is based upon a number of authorities in and out of the state. We refer counsel to the 7 Nebraska, 291; 10 Ohio Rep., 344; 12 Ohio Rep., 113; 45 O. S., 657; 26 O. S., 272-75.

If there was a waiver proven—as these authorities entitle the defendant to so prove under its general denial—then it is not difficult, after we have found that there was in fact a waiver—which we did in our former opinion—to also find that, by reason of the conditions amounting to a waiver, the contract between the parties, as a result of the delivery and of the delay on the part of the plaintiff in exercising its right, if any it had, became executed insofar as to entitle the defendant to the right of possession.

Some of the proof with reference to waiver was found in the testimony of Mr. Cavanaugh, and the plaintiff now asks that this be stricken from the record, for the reason that it had no application to the case, on his theory that it was not proper proof under general denial. What we have just said indicates that we regard it as our duty to deny such application.

The question of whether or not the sale made by the Biggs-

Watterson Co., to the Dairy Engineering Co. was conditional does not in this case involve any creditor.

The question as to right of possession is between these parties only.

The whole transaction indicates an extension of credit. The bill sent to the Engineering Company recites: "Terms one-third cash; balance 90 days trade acceptance with six per cent. interest." This account shows that the delivery was made with the intention of accepting as payment in greater part a trade acceptance, a higher form of security than the account itself. In other words, the contract between the parties was for something definite in the form of a new agreement which was to be taken for the property delivered.

An entry may be drawn in conformity to this and the former opinion of the court.

---

## MEANING OF THE WORD "HEIRS" AS USED IN A WILL.

Court of Common Pleas of Cuyahoga County.

CHARLES E. DENLEY, TRUSTEE UNDER THE WILL OF CAROLINE S. WELCH, v. FRANK E. WHEELER, FIELDER SANDERS, ET AL.

Decided, October Term, 1922.

*Wills—Circumstances under Which the Meaning of the Word "Heirs" as Used by a Widow—May be Ascertained by Reference to the Will of her Husband.*

The word "heirs" has a flexible meaning and in wills is sometimes used in the sense of children; and the rule which requires that this word when found in a will shall be given its technical meaning is not of application, where the circumstances surrounding a testatrix at the time of making her will, as well as her manifest intention, require that the word be understood as meaning children; as for example in the case at bar, where the testatrix was evidently desirous of carrying out the intention of her husband, and refers to his will where the word "heirs" is clearly used in the sense of children.

WILLIAMS, J.

There is involved in this case the construction of the last will and testament of Caroline S. Welch who died May 28, 1905,

about 80 years of age, a widow and without children. She executed her last will and testament October 22d, 1900. Her nephew, Harry Sprague, had lived with her previous to his marriage which occurred in June, 1900. During the lifetime of Caroline S. Welch one child was born to Harry Sprague, but it only lived a few hours and he died childless in May, 1918. leaving his widow surviving him. On August 8th, 1913, Harry Sprague by proper proceedings in the proper court of Ashtabula county, Ohio, caused Fielder Sanders to be designated as his heir under the provisions of Section 8598 of the General Code. The last will and testament of Caroline S. Welch contains the following provisions:

Item Eight: * * * To Harry Sprague the use and income during his natural life of another one-third of such remainder and the use and income of the same one-third to Elizabeth Sprague, wife of said Harry Sprague, if she survives him, and after the death of both Harry and Elizabeth the principal sum of said one-third remaining shall go to the heirs of said Harry Sprague.

Item Nine: Whereas devise was made by James S. Welch, my husband, deceased, in his will as recorded in Vol. N, page 251, of the records of Wills in the Probate office of Cuyahoga County, Ohio, and as in item 3 thereof, in which the sum of Ten Thousand ($10,000.00) dollars is to go to Adell Droyn out of his estate and at the death of me Caroline S. Welch, testatrix herein, and all the remainder of his estate save said Ten Thousand Dollars to go to the heirs of Ellen J. Wheeler upon the event of my death.

Now I, the said Caroline S. desire and direct that my executor in this will named fully execute the will of said James S. as set forth in said item 3 therein, and in accordance with the conditions in it made.

It is contended on behalf of Ellen J. Wheeler and her son, Frank B. Wheeler, that where the words "heirs" appears in the last will and testament of Caroline S. Welch, deceased, the testatrix used it in the sense of children, and that since Harry Sprague left no children the devise of the one-third of the residue of the estate will lapse as to the heirs of Harry Sprague and will go to the heirs of the testatrix.

The defendant, Fielder Sanders, maintains that the testatrix used the word "heirs" in its technical sense, and that since he has been designated the legal heir of Harry Sprague he will take such remaining one-third as the heir of Harry Sprague.

The contention of Fielder Sanders is no doubt well founded if the testatrix used the word "heir" in a technical sense. We think the reasoning in the case of *Smith* v. *Hunter*, 86 O. S., 107, would be applicable under such interpretation.

The opposing contention, that the word "heirs" was used by the testatrix in the sense of children, is based upon Item Nine of decedent's will which refers specifically to the will of her husband, James S. Welch, Item Three of whose will reads as follows:

Item 3d. Of what may remain of said estate at the death of my said wife, Caroline S. Welch, it is my wish and will that $10,000.00 shall go to Adell Sheberlies and any and all amount of said estate over said $10,000 shall go to the heirs of Ellen J. Wheeler and shall become theirs in possession when the youngest child of said Ellen J. shall arrive at lawful age and said minors, if any there be, shall be subject to guardianship until said time.

And in the event of the death of said Adell Sheberlies without leaving issue, then the bequest herein made to her shall go to the heirs of Ellen J. Wheeler and subject to the same control and conditions as the bequest to said heirs as named in this item.

It is very clear that James S. Welch when he referred to the heirs of Ellen J. Wheeler used "heirs" in the sense of children; and it is very plain that Caroline S. Welch when she used the term "heirs" of Ellen J. Wheeler in Item Nine of her will intended to give to the word "heirs" the same meaning as her husband had given it in Item Three of his will.

Where the word "heirs" appears in a will, the principle is well settled that heirs is used in its technical sense, unless a contrary intention appears. However, the word is a flexible one and is frequently used in the sense of children, and if there is anything in the will of the testator to indicate it was used in that sense, that meaning will be given to it in interpretation. *Jones* v. *Lloyd*, 33 O. S., 572; *Weston* v. *Weston*, 38 O. S., 473; *Durfee* v. *MacNeil*, 58 O. S., 238; *Cultice* v. *Mills*, 97 O. S., 112.

The authorities, however, lay down the rule that the interpretation of a will must be based upon the language of the will itself, and the meaning of the testator must be gleaned from the four corners of the instrument. To do this, however, the court should put itself in the position of the testator at the time

the will was executed so that the court may interpret the will in the light of all the surrounding circumstances known to the testator at that time. We quote the following from 28 R. C. L., 270·

While parol evidence is not admissible to show what a testator intended to write, it may be admitted in a proper case, where the effect of it is merely to explain or make certain what he has written. In ascertaining the testator's intent the words of the will are to be read in the light of the circumstances under which it was written, and the court may put itself in the place of the testator for the purpose of determining the objects of the testator's bounty or the subject of disposition. It is proper to take into consideration all the circumstances under which the will was executed. including the condition, nature and extent of the testator's property, and his relations to his family and to the beneficiaries named in the will. Even the motives which may reasonably be supposed to operate with him and influence him in the disposition of his property are entitled to consideration in ascertaining the meaning of the testator. So evidence is admissible as to the circumstances surrounding the subject matter of the gift. Accordingly the courts in construing a will have taken into consideration such matters as the financial condition of the beneficiary, when it appears that this was known to the testator.

In the 'case of *Stewart* v. *Powers*, 9 C. C., 143, the court held it was proper to admit evidence to show who the heirs of certain persons named in the description of the property were for the purpose of making clear in what sense the testator used the word "heir," and as the heirs were the children of the parties named the court held that the testator used the word "heirs" in that sense.

Therefore, we may look to the will of James S. Welch to which the testatrix referred for the purpose of determining in what sense of the word "heir" was used. As before indicated, it is apparent that the testatrix used "heirs" in the same sense in which James S. Welch used it in his will; that is in the sense of children. We therefore conclude that the devise to the heirs of Harry Sprauge lapsed and that the interest which they would have taken passes to the heirs of the testatrix. A. decree may be enacted accordingly.

## ADJUSTMENT OF THE COMPLICATED ACCOUNTS OF A DECEASED BROKER.

Common Pleas Court of Hamilton County.

THE CITIZENS NATIONAL BANK COMPANY, ADMINISTRATOR OF THE ESTATE OF JOHN M. ANDERSON, DECEASED, v.
FRANK N. ANDREWS ET AL.

Decided, April Term, 1923.

*Stock Bought through a Broker—Becomes Property of the Purchaser at Time of Purchase—Relation of Customer and Broker that of Pledgor and Pledgee—Rights Acquired by Administrator of the Broker—Stocks Pledged with the Broker and Repledged by Him—Rights of Sub-pledgees of Stocks—Each Fund Treated Separately—Customer must Trace his Securities—Right of Broker to Re-pledge Stocks Bought on Margin—Repledging of Stocks Wrongful, when—Customer upon Payment of his Debt to Broker may Recover Stocks up on Margin and not Sold—Claim against Estate of Deceased Broker by his Widow—Class A Claimants and Class B Claimants—Apportionment of Costs and Expenses.*

1. "Where a broker buys stock on the exchange upon the order of a customer, the latter is the owner of the stock from the time of the purchase, whether purchased in his name or not, and he has the right to the possession thereof on demand, subject to the payment to the broker for advances, if any, and commissions, as to which the customer is the debtor of the broker; in other words, the legal relation of the customer and broker is that of pledgor and pledgee." (*Lamprecht* v. *State*, 84 O. S., 32.)

2. "Upon such demand, the broker need not deliver the identical stock purchased for the customer, but it is sufficient to deliver the same number of shares of the same kind and value, and a failure to do so on demand may amount to a conversion of the stock and under some circumstances to a fraudulent conversion." (*Lamprecht* v. *State, Ib.*)

3. Upon the death of the broker, his administrator acquires no other or greater interest in such stock purchased for the customer than the broker had. Such administrator is entitled to possession of all the assets of the estate of the broker for the purposes of administration and distribution, but he is entitled to nothing other than assets of the decedent.

4. The administrator's duty is to collect debit balances from the customer. When the customer has paid to the administrator what he

owed the broker at his death, the administrator is no longer concerned with the stock of the customer, and any special property which the broker or the administrator had in the same to secure such indebtedness is entirely extinguished and such customer is entitled to the pledged stock.

5. The administrator is entitled to retain possessioon of securities of customers whose debit balances exceed the value of the securities of such customers on hand; also any securities of customers which are not claimed.

6. If the broker at his death had in his possession (and therefore not repledged) stocks of a customer who was not indebted to the broker, the customer had the right, upon demand, to the immediate possession of such stocks.

7. As to any particular security in the broker's hands at death, if there is sufficient of such to satisfy all claimants to such kind of security, each is entitled to have his own regardless of the matter of identification; or if there are several claimants to a particular kind of security not identified but there is not enough of such particular security in the administrator's hands to satisfy all claimants to such security, then the claimants are to share in the same proportionately. (Liberty Bonds.)

8. Where the broker had re-pledged stocks of customers in his possession with several sub-pledgees, it was the right of the latter to satisfy their claims out of such stocks regardless of the right of the broker as between himself and customers to re-pledge said stocks. After the satisfaction of the sub-pledgees, what remained of such properties in their hands were funds for liquidation and distribution amongst the customers whose stocks or the proceeds thereof were in such fund. Each fund must be treated separately from all others.

9. In order that a particular customer may make any claim to any securities in any such fund or the proceeds thereof, he must trace his securities into such fund. The administrator has no interest in such funds except as to costs and expenses to be hereafter considered, and any surplus after the customers participating therein are satisfied. In no event may a customer recover from any fund or funds more than his full claim.

10. If the securities of a particular customer so re-pledged by the broker were not sold by the sub-pledgee to satisfy its claim, the customer has the same rights to recover such securities as he would have had had the securities not been re-pledged by the broker, and had been found in his possession at death, subject to the obligation of the customer to contribute to the loss.

11. As to the right of the broker to re-pledge stocks of customers the contract, course of business, or customs of the business must be looked to as guides.

12. In the absence of a contract not to re-pledge such stocks, it is generally conceded that where a customer deals with a broker on margin, the latter has the right to re-pledge the stocks purchased for the customer, but a contract not to re-pledge will be enforced.

13. A re-pledge of such stocks is wrongful if the stocks were held by the broker for safe keeping, or if there were no transaction pending between the customer and the broker, or if the stocks were wholly paid for; but a customer may by contract or conduct authorize such re-pledge.

14. It seems that there is no difference as to the right to re-pledge stocks, between those purchased by the broker on margin, and stocks deposited by the customer with the broker as collateral security to customer's trading account. (Noyes case).

15. If the re-pledge of a customer's stock was wrongful he is given a preference, and is entitled to recover his securities or have a lien upon said fund if the securities have been sold, without contribution to the loss. If the fund is insufficient to satisfy all preferred customers (known as Class A customers) there must be contribution amongst them whether their stocks were sold or not.

16. If the re-pledge of such stocks of customers was rightful, such customers (known as Class B customers) are entitled to possession of their stocks found in such particular fund upon paying to the administrator the amount of their debit balances and contributing their proportionate share to the burden of the loan, or loss sustained by reason of the loan.

17. For purposes of liquidation and contribution the securities of the various funds should be valued as of the date of broker's death and interest charged on customers' accounts to that date.

18. The increment of any security follows the security.

19. A broker doing business as an individual in the firm name of A and P authorized certain persons to sign checks on his bank account in such firm name, adding the individual signature of such persons. The bank knew that P was dead, and was informed of the broker's death the day after it occurred. Thereafter checks on said account dated before the broker's death, signed as above stated, but with the abbreviation "Atty." added were presented to the bank, paid by it and charged to the broker's account. *Held*: The authority to pay such checks ceased upon the death of the broker, and the administrator is entitled to recover the sum of the checks so paid from the bank. (Fourth National Bank case.)

20. Where a customer's stock was wrongfully re-pledged by the broker, and sold by the re-pledgee and the proceeds applied to the account of the broker before his death, so that at the time of the death neither the stock nor the proceeds remained in the sub-pledgee's hands, the customer is not entitled to participate in any fund which may be in such sub-pledgee's hands. (Beneker's case.)

21. M was a margin trader with the broker who had purchased a certain stock and re-pledged the same. At the death of the broker there was found among his effects a certain other stock which M had deposited as collateral security to protect the said purchase and which was not re-pledged; the proper margin was maintained at all times. *Held*: M was entitled to recover said stock so deposited upon payment of his debit balance to the administrator without contribution to costs or expenses. (Munson's case.)

22. Where a customer during the life of the broker ordered certain stock which was purchased for him and charged to his account, and the stock retained in the broker's possession, and after the latter's death the customer paid in full for the stock to persons who conducted the said business, and the money paid for the stock was deposited in the account of said brokerage business, which afterwards passed into the hands of the administrator, the customer is entitled to receive the stock from the administrator. (Willsey's case.)

23. Evidence as to the claim by the son of the broker that he is the owner of a certificate of membership in the Cincinnati Stock Exchange considered, and held insufficient to support said claim, and held further that the proceeds of the same are assets of the estate to be paid to the admisistrator.

24. The wife of the deceased broker is a competent witness to testify in support of the claim of her son to said certificate, though she also has an independent claim against the administrator.

25. Husband and wife are competent to testify to acts or communications passing between them, if done or made in the known presence or hearing of a third person competent to be a witness; they may testify to the known presence of such third person.

26. A membership in the New York Stock Exchange although not evidenced by certificate or any document other than a letter from such exchange, is personal property which may be pledged, and a lien thereby created may be foreclosed and the seat sold subject to the constitution of the association. Evidence as to the alleged pledge by the broker to his wife examined and held sufficient to sustain such pledge and lien.

27. Where the widow of the broker asserts against the administrator a claim against said estate and is called as a witness on her own behalf and objection to her competency as a witness is made and sustained, and the administrator then proceeds to "cross-examine" her as to certain details of her claim, such cross-examination is a waiver of her incompetency and she may thereupon testify generally concerning her claim subject to the rule which excludes testimony as to privileged communications between her and her husband.

28. Under General Code 11495, paragraph 1, the claimant of such lien on said seat is competent to testify to facts occurring after the death of the broker.

29. The balance of the proceeds of the New York Stock Exchange seat remaining after discharging the lien of the widow is assets of the estate payable to the administrator, subject to rights of members of the exchange under its constitution.

30. The costs and expenses of this proceeding and other necessary expenses in preparing accounts of customers, in re-stating accounts and in other ways, should be paid according to the following rule: "These expenses should first come out of the general estate. If that is not sufficient then they should come pro rata out of the securities or their proceeds available to class B claimants. If not satisfied out of class B claimants or proceeds, then the balance, if any, for this purpose should be apportioned pro rata among class A claimants.

DARBY, J.

This action was instituted under favor of General Code, Section 10857, asking the direction and judgment of the court as to certain matters arising in the estate of John M. Anderson, deceased..

Anderson died March 13, 1921, and the plaintiff, as a creditor of his estate was appointed administrator. The estate has been represented to the Probate Court as insolvent.

Anderson was a broker, under the name of Anderson & Powell, dealing in bonds and stocks; was a member of the New York Stock Exchange, and, at least until September, 1919, was a member of the Cincinnati Stock Exchange.

The defendants were customers of Anderson in his brokerage business, or claim ownership of, or liens upon, certain property.

A very large part of the property referred to was at the time of Anderson's death re-pledged to Hornblower & Weeks, the correspondent of Anderson in New York, through whom his transactions were conducted on the New York Stock Exchange.

When the suit was filed, the residue of the Hornblower & Weeks fund was in the hands of Hornblower & Weeks; by a stipulation amongst the parties concerned, that fund has been brought to this jurisdiction, deposited with the custodian appointed by the Court, and all questions relating to the same submitted to the court in this action. The other re-pledges of Anderson were to local banks and individuals as security for Anderson's call loans.

Quite appropriately, the action as it now stands has been designated an "omnibus" suit.

The business of Anderson was conducted in the ordinary manner in which such concerns are carried òn, and the securities involved were to a great extent those purchased on margin by Anderson for his customers.

It will tend to clarify the discussion of this case if the exact relations subsistng between Anderson and his customers under these circumstances are clearly set forth.

### RELATION OF ANDERSON TO CUSTOMERS.

In *Lamprecht* v. *State*, 84 O. S., 32, which was a prosecution for embezzlement growing out of stock transactions, the court say:

".Where a broker buys stock on the Exchange upon the order of a customer, the latter is the owner of the stock from the time of the purchase, whether purchased in his name or not, and he has the right to the possession thereof on demand, subject to payment to the broker for advances, if any, and commissions as to which the customer is the debtor of the broker; in otheŕ words, the legal relation of the customer and broker is that of pledgor and pledgee. Upon such demand the broker need not deliver the identical stock purchased for the customer, but it is sufficient to deliver the same number of shares of the same kind and value, and a failure to do so on demand may amount to a

conversion of the stock, and under some circumstances to a fraudulent conversion.''

See also, pp. 39-42.

In *Richardson, Trustee,* v. *Shaw,* 209 U. S., 365, it is held:

''While a broker who carries stocks for a customer on margin may not be strictly a pledgee at common law, he is essentially a pledgee and not the owner of stock. *Markham* v. *Jaudon,* 41 N. Y., 235 approved.

''Neither the right of the broker to repledge stock carried on margin for a customer, nor his right to sell such stock for his protection when the margin is exhausted, alters the relation of the parties, is inconsistent with the customer's ownership, or converts the broker into the owner of the stock.''

A multitude of other authorities might be referred to in support of the foregoing principle, and indeed, except for the decisions in Massachusetts there seems to be a general agreement among the courts as above indicated.

Special attention however is called to the case of *Skiff* v. *Stoddard,* 63 Ct., 198, p. 224, where the court say:

''We are of the opinion that both reason and authority support the proposition that the relation of pledgor and pledgee existed between the plaintiffs (claimants) and Bunnell and Scranton (brokers) at the time of the latter's insolvency as respects the stocks and securities which they were then carrying for the former in the execution of their orders.

''From this proposition it follows that the plaintiffs as pledgors of the stocks and securities so carried, are entitled to redeem them. The assignment of Bunnell and Scranton does not interfere with the exercise of this right. The title to the pledged property was never in the insolvents. The plaintiffs have from the first been its general owners. The insolvent firm had only a special property in it. The assignment and appointment of the defendant as trustee in insolvency have never operated to deprive the plaintiffs of their ownership, nor to convert Bunnell and Scranton's interest into an absolute title in the trustee. The defendant trustee is not in the position of a bona fide purchaser for value. The creditors of the insolvents did not, prior to the assignment, have the right to appropriate the plaintiff's stocks and securities to the satisfaction of their claims. The transfer of the stocks into the name of Bunnell and Scranton upon the

books of the several corporations did not confer such right. *Mowry* v. *Hawkins,* 57 Ct., 453.

"The trustee in his capacity as a representative of the creditors can not therefore have acquired it. By the plaintiffs' exercise of· their privilege of redeeming the property, the creditors of the pledgees are not deprived of any right or advantage they ever enjoyed.. Redemption involves payment of the plaintiffs' several indebtednesses. From these payments the creditors obtain every benefit it was ever theirs to hope for."

As to the. duty of a trustee in bankruptcy concerning bonds which were wrongfully pledged and which have been recovered and identified, see *In re Amy, et al,* 263 F. R. 8, 10.

Neither the trustee in bankruptcy nor the administrator of a decedent's estate acquires any greater property or interest in the pledged property than the bankrupt or deceased had in the same.

The incident of bankruptcy or death of the broker does not alter in any degree the legal rights or interests which the customer has in his pledged property.

Most of the authorities, if not all, referred to in this action, have to do with the bankrupts' or insolvents' estates, but the principles involved in those cases are the same in general as should be applied in this case.

The administrator is entitled to possession, for the purposes of administration and distribution, of all of the assets of the estate of Anderson, but he is entitled to nothing more for the purposes of administration than the assets.

In this case the court appointed the bank which was also appointed as administrator, as the custodian of the fund known as the Hornblower & Weeks fund. There had been filed in the city of New York, by certain customers of Anderson, suits in which said customers sought to reclaim their securities in said fund which had survived the sell-out to liquidate the Hornblower & Weeks account.

The administrator claims that the whole of said Hornblower & Weeks fund should be paid to it as administrator, whereas the customers themselves claim that the administrator has no interest in such securities except as a pledge, and that all he is

entitled to recover in any event is the amount of indebtedness of the customers.

It is true as claimed by the administrator, that in bankruptcy proceedings the bankruptcy courts have assumed jurisdiction and determined the rights of the parties in the matter of reclamation proceedings. But it does not appear in any of those cases that any question was raised as to the jurisdiction of the court or the propriety of the court making such orders. In many of them it appears that the securities were found in the hands of the trustee and in others that the court ordered them paid to the receiver or trustee, but this seems to have been done without objection.

There is no good reason to justify the confusion or commingling of the securities of the customers with the assets of the decedent.

The court is of the opinion generally speaking, that the only interest in such pledged property which the administrator has, is to collect the debit balances due from customers, and when the customer has paid the administrator what he owed Anderson at his death, the administrator is no longer concerned with the securities of the customer, and any special property which Anderson or the administrator had in the same to secure such indebtedness is entirely extinguished.

As the court views the case, the administrator is also entitled to retain possession of the securities of customers whose balances exceed the value of the securities on hand.

In *In re Carrothers,* 182 Fed., 501, it is held:

"7.   Where stock brokers in bankruptcy had certain securities in possession of their New York correspondents belonging to customers who were indebted to the bankrupts in excess of the value of the securities bought for them, and the account against such customers was uncollectible, the loss sustained by such bad account being one that would fall on the general creditors, and not on those holding other securities in the hands of such New York correspondents, the general creditors should have a pro rata share in the New York account in proportion to such bad accounts."

The administrator is also entitled to any securities of customers which are, not claimed:

In *In re Pierson et al*, 238 Fed., 142, the court say:

"That the shares of those who claim should be increased by the circumstance that other long customers made no claim, would be inequitable. What would otherwise have gone to those customers should go to the general creditors."

Before leaving the subject of the claim of the administrator that the Hornblower & Weeks fund should be turned over to it, it is proper to call attention to the fact that it frequently happens that a decedent has in his possession, property which is left there by the owners for safe keeping, or which the decedent held in pledge, and the proper way is for the owner to make claim and proof of his property, and in case of a pledge to pay the balance due to the administrator, when the property is returned to the owner.

It was said in the case of *In re McIntyre* (Pippey's Appeal), 181 Fed., 955, at p. 959:

"If he (Pippey) had been left undisturbed to prosecute the replevin suit, he would have recovered the specific piece of property which he owned, had identified, and was entitled to."

What has been said with reference to the so-called Hornblower & Weeks fund as to the rights of the administrator, should apply equally to the other loan funds, and in case the administrator has come into possession from any of Anderson's pledgees, of the property of Anderson's customers, it should be treated in the same manner.

Since the administrator and custodian is one and the same corporation, represented by one and the same counsel, there can be no confusion of account, or difficulty of settlement with any of the customers.

### THE SEVERAL FUNDS IN GENERAL.

At the time of Anderson's death, as stated, there had been repledged customers' securities with Hornblower & Weeks in New York. certain banks and individuals in Cincinnati, for An-

derson's loans.. The pledgees satisfied their claims out of such securities, as they undoubtedly had a right to do, whether as between Anderson and his customers the re-pledge was wrongful or rightful, and after such liquidation there remained stocks or cash, or both, in the hands of such pledgees.

As to each of these loans, therefore, certain particular securities of customers were re-pledged. Their property, after liquidation by the sub-pledgee, remained in its hands, and it follows that each separate fund should be considered and treated separate from all others. *In re Jamison* (C.C.A.), 209 Fed., 541; *In re Wilson*, 252 Fed., 631, 642; *Skiff* v. *Stoddard*, 63 Ct., 198, 227.

It is clear, therefore, in order that any particular customer of Anderson may make any claim to any of the securities in any particular fund, or the proceeds thereof, he must trace his securities into such particular fund. In other words, a customer whose securities were re-pledged with Boye, would have no right or claim in the Fourth National Bank fund, because of his securities in the Boye pledge. So far as the administrator is concerned (excepting from the present consideration the matter of costs and expenses and any surplus which may remain after satisfying claimants), when there is paid to it the debit balance owing by a particular customer, the administrator has no further interest in any of the securities of such customer, whether they be in one or more of such funds, but the customer should not in any event recover more than his full claim.

### CUSTOMERS' SECURITIES NOT RE-PLEDGED.

Certain stocks and bonds belonging to, and identified by customers, were in Anderson's possession at his death, and therefore were not re-pledged. These are now in the hands of the administrator. If the owner of such stocks and bonds were not indebted to Anderson at the time of his death, and he was not carrying any trades for him, such owner was entitled to the imdiate possession of such property upon demand.

If such claimants were indebted to Anderson as of the date of his death, they were entitled to the possession of such property upon the payment of their debt to him. (Munson case).

The debit balances were due Anderson at his death, and therefore are assets of his estate, and payable to the administrator.

As to any particular security in Anderson's hands at death, if there is sufficient of such to satisfy all claimants to such kind of security, each is entitled to have his own, regardless of the matter of identification; or if there are several claimants to a particular kind of security not identified, but there is not enough of such particular security in the administrator's hands to satisfy all claimants to such security, then the claimants are to share in the same proportionately.   (Liberty bonds.)

*Duel* v. *Hollins,* 241 U. S., 523.

What has been said as to securities in the hands of the administrator not re-pledged, applies equally to the securities remaining in the hands of Anderson's sub-pledgees after liquidation.

Any customer whose securities were not in Anderson's hands at his death, or were not re-pledged by him in any of the funds referred to, can not have a claim against such securities or funds.

### THE STATUS OF CLAIMANTS TO PROCEEDS OF FUNDS.

The rights of claimants may be said to depend in the first place upon the question as to whether the re-pledge of the securities by Anderson was wrongful or rightful.

If the re-pledge was wrongful, in that Anderson at the time and under the course of dealings between him and his customer, had not right to re-pledge such securities, the customer is placed in what is known as Class A, and is entitled to recover his security, or have a lien upon the fund if his securities have been sold.

Claimants placed in Class A have superior equities, and therefore may recover their securities without contribution, except possibly for expenses.   If the fund is insufficient to satisfy all Class A customers, there must be contribution amongst them, whether their stock was sold or not. *In re Wilson* (Rolph's claim), 262 Fed., 631.

As to the right to re-pledge, the contract, course of business, or custom of the business must be looked to as a guide. If the securities re-pledged were wholly paid for, there was no right to re-pledge.

If the securities were held for safe-keeping, there was no right to re-pledge. If the customer was not indebted to the broker the same is true. If no transaction existed between the broker and the customer at the time of the re-pledge, the latter was equally wrongful.

It is generally conceded that where a customer deals with a broker on margin, the broker has the right to re-pledge the customer's stocks purchased for him, to secure his own loans in order to carry on his business. This right is frequently expressed in the contract, but if not expressed, it is generally implied as a necessity of the business.

The right of the broker to re-pledge securities which are pledged with him as collateral security to the account, and not as margins, will be considered later. Those customers therefore who were dealing upon margins, or who had authorized the use of their collateral stocks, are to be placed in Class B, their equities being inferior to those of the Class A customers.

Leaving out of consideration again for the time the question of costs and expenses, it seems clear that the Class B customers are entitled to possession of their stocks upon paying to the administrator the amount of their debit balance to Anderson's estate, and contributing to the burden of the loan or loss their proportionate share.

For the purpose of liquidation and contribution, the securities in the various funds should be valued as of March 13, 1921, the date of Anderson's death, and interest on the various accounts should be charged to that date. The increment should follow the security.

### INDIVIDUAL CLAIMS.

The court has not undertaken to do more than state general rules and principles which should be a guide as to the questions raised upon the pleadings. Arguments have been general as to the claims of the administrator on the one hand and the various defendants on the other. Only in cases in which customers have filed briefs claiming certain particular rights will the court go outside of the statement of general principles.

### Noyes' Claim.

Briefly stated, the claim of Noyes is that at the time of the death of Anderson, the latter was carrying for Noyes, stocks upon margin, and that said Noyes had indorsed in blank and delivered to decedent as collateral security for the full performance of any obligations growing out of such transaction, certain other securities.

Noyes claims that as to the collateral security the decedent had no right to re-pledge, although it is conceded that as to the stocks carried on margin there was such right. He therefore claims that as to the collateral security so re-pledged that he is entitled to the benefit of a prior lien, though as to the stock carried on margin, which was not wrongfully re-pledged, he stands as a Class B customer.

The claim of the administrator on the other hand is, that there is no difference as between the two classes of securities where the trader is a margin customer, and indebted to the broker.

Upon the hearing the court reached the conclusion under the circumstances as stated, that the re-pledge of Noyes' collateral stock was not authorized, and that to the extent that the pledge of his stock was not authorized he was entitled to a preference. In reaching this conclusion and in the original opinion, reference is made to the following cases: *Thomas* v. *Taggart,* 209 U. S., 385; *Skiff* v. *Stoddard,* 63 Conn., 198-200 (second from last syllabi); *In re McIntyre,* (Pippey's case), 181 Fed., 955; *In re Ennis* (Bamford's Appeal), 187 Fed., 720; *In re Toole* (Petition and Appeal of Foster), 274 Fed. 337 (special attention being directed to the dissenting opinion of Manton, Circuit Judge); 35 Harvard Law Review, 486; *Furber* v. *Dane,* 203 Mass., 108, 115; *In re Wilson,* 252 Fed. 631, 636 (Rolph's claim); *Richardson* v. *Shaw,* 209 U. S., 365-374.

The original opinion of the court was based upon the distinction between stocks deposited with Anderson as margin, and those deposited as collateral security for future dealings.

A re-hearing of Noyes' claim was had upon application of certain of the creditors, and it was then conceded by counsel for Noyes, that the pledge of this collateral stock was not wrongful— whether that be by reason of the contract or custom does not

appear; but the claim is that as between the creditors of Anderson whose stock was pledged with Hornblower & Weeks, that Noyes is still entitled to preference.

Upon re-consideration and upon the assumed right of Anderson to re-pledge Noyes' collateral stocks, it is held that there is no difference between the claims of persons whose re-pledges were rightful, based upon a supposed and possibly real distinction between margin stocks and collateral stocks.

## FOURTH NATIONAL BANK CLAIM.

For several years prior to his death, Anderson did business as Anderson & Powell, with the Fourth National Bank. He carried a general deposit account there. Powell, formerly associated with Anderson in business, was dead, as was well known to the bank. The usual card indicating authorized signatures for said checking account bears date November 8, 1917. The authorized signatures are as follows: "Anderson & Powell, J. M. Anderson; Anderson & Powell, Wm. S. Hill; Anderson & Powell, John M. Anderson, Jr."

Anderson died March 13, 1921, of which occurrence the bank was informed March 14th. Thereafter checks bearing date prior to Anderson's death were paid by the bank from the account of Anderson & Powell. These checks were signed either "Anderson & Powell, By John M. Anderson, Jr., Atty.," or "Anderson & Powell by W. S. Hill, Atty."; the words "Anderson & Powell By" were printed on the checks, but the individual name was written.

It is claimed by the administrator that these checks were paid without right or authority; that as Anderson was dead, any authority of the bank to pay checks upon said account had ceased with his death.

The bank on the other hand claims that the facts above set out and admitted, justified it in the belief that there was a partnership actually existing between the signers of said signature card, and that it was authorized to pay said checks.

The bank knew that Anderson and Powell were dead. It was authorized to pay checks upon authorized signatures; the signatures to these checks were not authorized. If there were a part-

nership it was unusual and unnecessary that a partner should sign the checks as attorney or employee.

These facts, if they do not actually contradict the theory of a partnership, at least put the bank upon inquiry, which would have revealed that there was no partnership, and that the signers of these checks were just what they represented themselves to be by their signatures, to-wit, agents or employees of a deceased broker!

The authority to pay such checks ceased upon the death of Anderson.

*Covert* v. *Rhodes*, 48 O. S., 66, on p. 72 the Court say:

"There is little if any conflict of authority upon the proposition that on notice of the drawer's death before acceptance by the bank, its right to pay the bill or check ceases, and its indebtedness to the drawer becomes assets of his estate."

There being no proof of a partnership, or evidence to justify the bank in believing that a partnership existed after the death of Anderson, the case of *Enck* v. *Gerding*, 67 O. S., 245, relied upon by the bank can have no application.

The conclusion of the court is, that the administrator is entitled to recover from the Fourth National Bank the sum of the checks so paid after Anderson's death.

## BENEKER'S CLAIM.

A brief was filed on behalf of Henry W. Beneker; his claim is, that at the time of Anderson's death, and for some days prior thereto, Beneker had a credit balance of $570 in his trading account with Anderson. He had paid in full to Anderson for certain stock purchased in March, 1921, which however, was re-pledged by Anderson with Hornblower & Weeks. The re-pledge of his stocks was wrongful, and as to them there is an unquestionable right to reclaim, or in the alternative, a lien on the fund.

Beneker claims, in addition, that he should also be placed in Class A as to other stocks which Anderson had purchased for him in December, 1920, and which had been re-pledged to Hornblower & Weeks and sold by the latter for Anderson's ac-

count in December, 1920. He claims that the repledge of the last mentioned stocks was wrongful because they were held by Anderson as collateral security.

The right to reclaim or to share in the proceeds of any fund depends upon the customer tracing his securities into that particular fund. If the securities or the proceeds were in the fund at the time of Anderson's death, there would seem to be no question but that the customer in such case would be entitled to share in the fund. But if, prior to the death, the securities had been wrongfully converted by Anderson; or if there was a wrongful re-pledge, and the securities sold by the re-pledge for Anderson's account, there is no right to a lien upon the fund as to those securities, because in fact at the time of the death, neither they nor the proceeds were in the fund.

The fact that a customer has been defrauded, or has a large equity generally, will not entitle him to a lien upon the fund of which his securities were not a part.

Again, if a customer was a debtor to the broker, and the latter by fraud converted sufficient of the property of the customer to wipe out his debit balance and thus make him a creditor, he would have a right to claim as a Class A customer as to his securities traced into the fund in question, and remaining there at Anderson's death..

This is what the court understands to be the meaning of the cases:—*In re Wilson* (Godwin's claim), 252 Fed., 642; *Ex parte Ennis* (Bamford's claim), 187 Fed., 721, 724.

The reasoning of the court in the Wilson case, supra (Rosenthal's claim, 640) seems to be in accord with the foregoing statement.

The court is therefore of the opinion that as to the stocks of Beneker, he is entitled to a lien upon the fund only in case he is able to trace said stocks or their proceeds into the hands of Hornblower & Weeks, and find them there after the death of Anderson; otherwise any customer whose securities were at any time wrongfully re-pledged would be a Class A customer, no matter what use the re-pledgee may have made of the securities, or how long before death or bankruptcy they may have been disposed of by the latter.

## Munson's Claim.

Munson had been a margin trader with Anderson, but his trades had all been closed except one, which was the purchase of one hundred shares of Steel Common, bought upon margin. The steel stock was re-pledged to Hornblower & Weeks, and was sold by it after Anderson's death, in the liquidation of its claim.

There was found in Anderson's box after his death, forty-five shares in the aggregate, of the capital stock of the Bibb National Bank of Macon, Georgia, which the evidence tends to show was pledged by Munson as collateral security to protect this purchase of Steel Common. The required margin was at all times maintained.

There is really no dispute as to Munson's right to reclaim and re-possess this Bibb stock; the only dispute is as to the terms upon which that shall be done. Under the general principles as hereinbefore established, Munson must pay his debit balance, and the court has already ruled that he must pay this debit balance to the administrator, who takes the claim just as Anderson left it.

The administrator, however, claims that Munson is required to contribute to the costs and expenses before he is entitled to his stock. In fact, the stock is now in the hands of Munson, having been recovered in a suit in replevin, and upon the giving of a re-delivery bond.

The administrator claims that Munson should be charged the costs of his proceeding in the Probate Court to recover possession of the stock; also the cost of his action in replevin; also a proportionate part of the costs of this proceeding, and of the expense to which the administrator has been put in getting up the accounts for Anderson's customers.

Munson was not a party to the actions brought in New York hereinbefore referred to. The law is well settled as to his right to reclaim his stock upon payment of his indebtedness. The administrator refused to acknowledge his right, and seemingly, solely upon the claim that Munson should contribute to costs and expenses, did the administrator base his action.

If one is entitled to the possession of property, and is forced to resort to law to gain possession of it, he should not thereby

be charged with the costs. While the administrator should exercise every diligence to protect its decedent's estate, it is not authorized in arbitrarily failing to recognize legal rights and interests of pledgors of stock or property, and upon a proper claim and tender of the payment of the amount due, there is no question as to the administrator's duty. All that was necessary was for the administrator to present its claim and demand payment. The books of Anderson were open to determine the amount of indebtedness of Munson, and there seems to be no question but that a legal tender was made to the administrator. So far as this Bibb stock is concerned, Munson was in no way involved in the Hornblower & Weeks fund, except in knowing the amount for which his Steel Common stock was sold, and deducting that from the amount of his indebtedness to reach the net debit balance.

That Munson had a right to replevin, see *In re McIntyre* (Pippey's appeal), 181 Fed., 955, p. 959.

In the opinion of the court, Munson is entitled to recover his stock without costs, and without any contribution for expenses.

### GIERINGER BROTHERS (WILLSEY) CLAIM.

On March 8, 1921, Willsey, through Gieringer, gave an order to Anderson for the purchase of five shares of Willys-Overland stock, which order was filled by the purchase of said stock on that day, and the account of Gieringer charged with the purchase price, $38.50.

After Anderson's death, to-wit, on March 22, 1921, upon the bill for said purchase being received, the said sum was paid at the office formerly conducted by Anderson and Powell, to Hill and Anderson. A receipt was given with the indorsement: "Stock to be delivered upon receipt from New York" and the cash deposited in the Fourth National Bank to the credit of the Anderson and Powell account. Subsequently the stock was delivered to the administrator, who still holds it. Willsey asks for the delivery of the stock.

Under the authorities herein referred to, upon the purchase of the stock for Willsey, the latter became the owner of the stock and Anderson but a pledgee.

Upon payment of the amount due to Anderson, Willsey

would have been entitled to immediate delivery of the stock. Upon payment of the amount due the estate, Willsey is entitled to his stock.

The bank deposit into which this payment found its way is in the hands of the administrator, though it got there through the agency of unauthorized persons. This being the fact, it would seem that Willsey is entitled to receive his stock, and the court so advises the administrator.

### CINCINNATI STOCK EXCHANGE MEMBERSHIP.

The administrator has possession of a certificate of membership in the Cincinnati Stock Exchange, in the name of John M. Anderson, Jr., who claims the membership. This certificate was found in the box of Anderson and Powell, to which J. M. Anderson, J. M. Anderson, Jr., and W. S. Hill had access. The envelope containing it was inscribed with the following words: "Stock Exchange Membership, John M. Anderson, Jr." In the same box was also contained personal property of Mrs. John M. Anderson and others, which was returned to them by the administrator. The certificate is in the following words:

"Organized 1885.                              Incorporated 1887
THE CINCINNATI STOCK EXCHANGE
No. 100.
CERTIFICATE OF MEMBERSHIP.

This certifies that John M. Anderson, Jr., is a member of the Cincinnati Stock Exchange in good standing at the date hereof.

The membership hereby represented is subject to the rules governing the said Association and, if not impaired, or forfeited under the provisions of the Rules and Regulations, is transferable upon the books of the Association to any person elected by the Board of Officers, upon the assignment and surrender of this certificate in form as provided on the reverse hereof, and upon payment of all indebtedness to the Association and an initiation fee provided by the Rules and Regulations.

(seal)          Witness the signatures of its President and Secretary at Cincinnati, Ohio, this twenty-third day of September, 1919.
W. E. Hutton, President,
H. M. Beazell, Secretary.
*Reverse side.*
For value received I hereby assign to ......................

all my rights to the within Certificate and the Membership represented by the same.

Cincinnati, Ohio, ....................

John M. Anderson Jr.

Witness ....................."

The testimony offered relating to the certificate and its so-called transfer to Anderson, Jr. was given by Mrs. Mary P. Anderson, who was the wife of the deceased.

A preliminary question arose as to her competency as a witness, to prove statements made by the decedent to John M. Anderson, Jr. in her presence. It was claimed that Mrs. Anderson was a party to the action, and was therefore incompetent.

While it is true that Mrs. Anderson is a party in the sense that she has a separate claim against the estate,, yet as to said claim of Anderson, Jr., she was not a party, and was competent to testify concerning his claim, as any other witness, and as though she had no claim of her own.

The suggestion that Mrs. Anderson was incompetent to testify because the statements were in the nature of privileged communications is equally untenable, for the reason that by her testimony it clearly appears that the statements concerning which she testified were made in the known presence and hearing of a third person, to-wit, John M. Anderson, Jr.

Husband or wife called to testify to an act or communication is competent to testify to the known presence of a third person. *McCague* v. *Miller*, 36 O. S., 595.

Husband or wife may testify notwithstanding death of said third person before trial. *Sessions* v. *Trevitt*, 39 O. S., 259.

The court is therefore of the opinion that Mrs. Anderson was a competent witness to testify to the statements made by the decedent concerning the membership referred to.

Mrs. Anderson's testimony in substance was that upon the return of Anderson, Jr., from the World War, September, 1919, the decedent said to him that—

"he could have his choice of returning to college or going into the brokerage business with him, as an employee. He said to my son in my presence that if he went into the brokerage business he would turn over to him his seat on the Cincinnati Stock Exchange—certificate for the seat."

That later the decedent stated to Mrs. Anderson in the presence of Anderson, Jr.:

"I have turned over my seat on the Cincinnati Stock Exchange to Mitchell; he is now a full-fledged broker."

When the certificate was found in the box of Anderson and Powell, it was indorsed in blank. The reason for the same, as appears by the profert of counsel for Anderson, Jr. on page 56 of the record is as follows:

"That as soon as he (Anderson, Jr.) received the certificate from his father, he indorsed it in blank, and that the reason for so doing arose from a custom of all brokers to indorse such securities as came into their hands at once, so that they may become liquid and easily accessible for sale or borrowing for use as collateral in the owner's absence as well as in his presence to attend to personally."

Thus it appears that the certificate so made out in the name of Anderson Jr., (which has been called a transfer to him) was indorsed by him in blank for the uses of Anderson and Powell. It must be remembered that Anderson, Jr. was in the employ of Anderson and Powell, and was not otherwise connected with the business, as owner, or in any other capacity.

Evidence was also offered tending to show that subsequent to the issuing of the certificate to Anderson, Jr., that Anderson and Powell advertised that it was a member of the Cincinnati Stock Exchange; letterheads and statements in use at and prior to the death of Anderson were offered in evidence containing the advertisement to that effect. The membership was shown to be valuable, and its value was fixed at something like $3,000. The advertisement of membershop in the stock exchange was for the benefit of the business of Anderson and Powell. No evidence was offered on behalf of Anderson, Jr., tending to show that he ever paid the annual dues to this stock exchange.

Evidence was offered on behalf of the administrator, of the account books of Anderson and Powell, which tended to show that the Cincinnati Stock Exchange membership was carried as an asset of Anderson and Powell, after the certificate was issued to Anderson, Jr.; and certain entries indicating that the dues were

paid to the stock exchange by Anderson and Powell, and not charged to any account of Anderson, Jr.

Objection was made to this evidence, upon the ground that it was in the nature of self-serving declarations, and that declarations of Anderson in the books oof Anderson and Powell after the transfer of said membership, were incompetent as evidence against Anderson, Jr.

While it may be accepted as a general rule that declarations by a vendor or transferor concerning his ownership of property sold or transferred, after he has parted with the ownership are generally not admissible, yet the question in this case was as to whether or not Anderson had transferred the beneficial ownership in said membership to his son.

As reflecting upon the nature of the actual transaction between the deceased and his son, are the facts already referred to; i. e. the indorsement in blank, the finding of the certificate in the box of Anderson and Powell indorsed for the uses and benefit of Anderson and Powell, the advertisement that Anderson and Powell was a member of the Stock Exchange, and the failure of any proof on the part of Anderson, Jr., that he had paid any of the dues to the Stock Exchange.

While the testimony of Mrs. Anderson was that the decedent had "turned over" to his son said certificate, and that the letter was now a "full-fledged broker," this language is not of so clear a character as to indicate that there had been a transfer of the beneficial interest, especially in view of the use which Anderson, Jr. afterwards made of the certificate, and the other evidence referred to.

The Court is therefore of the opinion that the evidence offered on behalf of the administrator as to the items in the book was relevant, as showing the actual character of the transaction between the deceased and his son.

The son testified that he knew that there was an account in the books entitled "Cincinnati Stock Exchange" when he came into the office, and he claimed to have no further acquaintance with the books after that time.

The evidence is that the books contain an entry under the heading "Cincinnati Stock Exchange Seat, January 1, 1920" (several months after the so-called transfer of this seat to Anderson, Jr.) reading, "Balance" "$4,000..00," under head of

"Deposits." The books also show, running through the period from September, 1919 to January 3, 1921 under the same head, expense charges for the Stock Exchange dues, in but one case of which there is a reference to "J. M. A. Jr."

The entries in the books were made before any question or controversy arose as to the ownership of the membership.

The value and benefit to a broker of such a membership is shown in *Anderson* v. *Durr, infra.*

The evidence, other than that relating to the books, supports an inference that there was no intention to transfer the beneficial interest to Anderson, Jr. That being the case the rule of exclusion invoked by counsel for Anderson, Jr. should not apply and the court holds it does not apply. If the controversy were between the father and son over this seat, there could be no question that the father could testify as to the character of the transaction, though it contradicted the effect of the writing, and he could offer corroborative evidence of his testimony to show that it was not his intention and was not the understanding of the parties that the beneficial interest be transferred.

The court is unable to see any reason why, the father being deceased, the same character of evidence should not be received on behalf of the administrator.

The evidence further is that Anderson, Jr. transacted the business for Anderson and Powell on the stock exchange, and it was presumed that he knew the rules, and that he was bound to pay dues. His failure to offer evidence that he paid dues is at least an admission that they were paid by somebody else, who was his employer, and there is no evidence that there was any objection to this at any time.

The court is therefor of the opinion that the proceeds of the sale of the Cincinnati Stock Exchange seat should be paid to the administrator.

### MRS. ANDERSON'S CLAIM.

There was offered in evidence a document admitted to be in the handwriting of the decedent, of which the following is a copy:

"Jan. 1st 1919.

"In consideration of Mary P. Anderson having loaned me as

capital for Anderson & Powell twenty-five thousand $25,000.00 U. S. Liberty 3 1-2 per cent bonds. I hereby pledge to her for the repayment of this loan my membership in the New York Stock Exchange to that amount.

John M. Anderson.''

Mrs. Anderson was called as a witness in support of her own claim based on said writing; upon objection it was held that she was not a competent witness to testify in her own behalf, and after testifying to some other matters which are not involved in this question, the attempted examination in chief was concluded. Thereupon, counsel for the administrator asked her certain questions relative to her claim, and bearing upon its validity. Against the objection of her counsel, she was permitted to testify that she had not notified the New York Stock Exchange, nor any of the parties to this suit, that she had such a lien.

After this cross-examination, her counsel asked the privilege of interrogating her further concerning her claim, and the court, reserving decision for further consideration, permitted her to testify, and she did testify that she had loaned her husband bonds, and that he had delivered to her the paper spoken of as the lien in this case.

It was claimed that as she was an incompetent witness, that the cross-examination referred to did not justify further examination concerning her claim.

It is conceded that as an interested party she was generally incompetent under Section 11495 G. C. If she had not been cross-examined there would have been no opportunity to interrogate her as to her claim, but counsel for the administrator chose to cross-examine her, as they had a right to do under Sec. 11497 G. C.:

''At the instance of the adverse party, a party may be examined as if under cross-examination, either orally or by deposition, like any other witness. * * *

This section and the other sections bearing upon the competency of witnesses and parties to testify, were under consideration in *Roberts* v. *Briscoe,* 44 O. S., 596, and in discussing the object of the section referred to, the court say, on p. 602:

''The interest of an estate may urgently require that an exec-

utor or administrator should waive what belongs to him as a privilege, and call the opposite party as a witness. The facts upon which he founds his defense, or upon which he bases his claim may be locked up in the breast of the adverse party, and without his testimony a failure of justice may ensue. The legislature could not have designed to place the estates of deceased persons at such disadvantage by depriving them of evidence within reach, necessary to their protection against imposition and fraud. The adverse and surviving party, when compelled to testify by the executor or administrator, can not reasonably complain; for, though a party, he can then be examiined fully in his own behalf on the subject of his examination in chief. *Niccolls* v. *Esterly*, 16 Kan., 32; *Wharton on Evidence*, Sec. 475A."

The defendant in a criminal case, who produces his wife as a witness in his favor (she not being ordinarily a compellable witness against him) waives the question of the incompetency of the witness, and she may then be cross-examiined the same as any other witness; except as to confidential communications.

*Haberty* v. *State*, 8 C. C., 262. Motion for leave to file petition in error in Supreme Court refused. See also: *Niccolls* v. *Esterly*, 16 Kan., 32, opinion by Brewer, J.; *Plowman* v. *Nicholson*, 81 Kan., 210.

Under these authorities there can be no question but that the cross-examination of Mrs. Anderson by the administrator constituted a waiver of her incompetency, and she was then competent to testify as any other witness, limited of course by the rule that acts and communications between husband and wife are absolutely barred unless made in the known presence or hearing of a third person competent to be a witness.

*Dick* v. *Hyer*, 94 O. S., 351; *Dischner* v. *Dischner*, Court of Appeals, first circuit; *Haberty* v. *State*, *supra*.

It does not appear that the act and communication testified to by Mrs. Anderson, which took place between her and her husband, occurred in the known presence or hearing of a third person competent to be a witness; therefore her testimony as to those facts was inadmissible, and is now excluded from consideration.

The document does not constitute a "communication" within the meaning of the section. See *Holtz* v. *Dick*, 42 O. S., 23, 26.

Another question relating to the testimony of Mrs. Anderson was as to her possession after the death of her husband, of the document above described, which she testified she took from a safe in her possession after his death, and gave to her counsel. This last testimony is competent from two viewpoints—first, it was made relevant by the cross-examination on behalf of the administrator; second, it related to facts occurring after the death of the decedent, and is therefore admissible under G. C. Section. 11495, paragraph 1.

Her possession of this document after the death of her husband gave rise to two presumptions, one, that she was the owner of the document, and the other that the specified loan of bonds had not been repaid.

The evidence in the case further is, that the books of Anderson and Powell contain no entry of this transaction. Further, there was evidence by Mrs. Anderson that in the settlement of an estate she had received some of the bonds, and there was no attempt to contradict or deny this statement; so that there was evidence that she had the bonds, and the document being in the handwriting of the decedent speaks for itself.

It is claimed, however, that no notice of the alleged lien was given to the New York Stock Exchange, nor to any other persons, and the same is therefore invalid. The court is of the opinion that notice is not necessary, and that the rules relating to recording do not apply to liens of this character. See *Jones on Collateral Securities*, Sec. 6, and note, and Sec. 136.

It is further claimed that the New York Stock Exchange seat is not subject of pledge.

The nature and character of this identical seat is fully discussed in *Anderson* v. *Durr, Auditor*, 100 O. S., 251, pp. 257 to 260. A certificate of such membership is not issued as in the case of the Cincinnati Stock Exchange, but the New York Stock Exchange by letter notifies the member of his admission.

It has been held that a membership of this character may be pledged and a lien thereby created may be foreclosed, and the seat sold, subject to the constitution of the association. *Clute* v. *Loveland*, 68 Cal., 254, 261; *Nashua Savings Bank* v. *Abbott*, 181 Mass., 531, 535; *Ketchum* v. *Provost*, 141 N. Y., Sup., 437; *O'Dell* v. *Boyden*, 80 C. C. A., 397, 403; 150 F., 731.

The Court is of the opinion that said pledge constituted a valid lien against the proceeds of the New York Stock Exchange seat.

### RESIDUE OF PROCEEDS, NEW YORK STOCK EXCHANGE SEAT.

At the time of Anderson's death, there were in the hands of Hornblower & Weeks, securities of great value of the customers of Anderson. Acting under Article 28 of the Constitution of the exchange, Hornblower & Weeks liquidated its claim by selling certain of said securities and leaving on hand a very large sum in securities and cash.

The so-called "seat" of Anderson on the New York Stock Exchange was very valuable. It has already been held that Mrs. Anderson, wife of the broker, has a valid lien upon said "seat," to secure the repayment to her of $25,000 loaned by her to her husband. The residue of the proceeds of this "seat" are involved and to be disposed of.

The administrator claims the proceeds as part of the general estate, for administration and distribution to general creditors under the laws of Ohio.

The customers of Anderson whose securities were repledged by Anderson to Hornblower & Weeks claim this fund upon the equitable ground that Hornblower & Weeks should have exhausted its claim against said "seat" prior to the sale of their securities so pledged; or, that since Hornblower & Weeks has satisfied its claim out of the securities of the customers repledged by Anderson, that the said customers should be subrogated to the rights of Hornblower & Weeks to the proceeds of said "seat."

Article 15 of the Constitution of the Exchange provides for the disposition of the proceeds of the "seat," upon transfer of membership, voluntarily or by death, and provides that, subject to the payment of claims of the stock exchange, claims of members arising upon contracts shall be paid if allowed by the committee on admissions of the exchange, and the balance goes to the member or his personal representative.

It is the claim of the customers whose stock was re-pledged to Hornblower and Weeks, that regardless of the funds and securities available to Hornblower & Weeks, they should first have

sought satisfaction by the sale of the "seat" referred to, and that if that were not sufficient (as of course it was not), it might then resort to securities in its hands by way of pledge, to fully satisfy its claim.

It will be presumed that all persons dealt with Anderson as a broker (and otherwise), on the strength of the character he had in part at least as a member of the New York Stock Exchange. All his customers, as well as other creditors were affected by such standing.

Should this valuable asset of his estate be now made available to certain of his customers, *i. e.*, those whose securities happened to be re-pledged to Hornblower and Weeks, to the exclusion of others whose securities happened to be pledged to other persons (but who otherwise stand in substantially the same position), and to the exclusion of his general creditors?

As between two creditors, one of whom has liens upon two funds, and the other of whom has a lien upon but one of said funds, the general right to require the creditor who has the two securities to proceed first against the fund upon which the other creditor has no lien, is recognized; but in the only cases to which attention has been called in which the exact situation presented here was considered, the courts held that the equitable ground here invoked does not apply, and that the correct interpretation of the articles of the New York Stock Exchange is that the "seat" is only available to a member in case of insufficiency of securities or contracts to satisfy the claim of said member. *In re Van Schaick and Company* (Appeal of Lyon), 228 Fed., 465; *In re H. B. Hollins and Company* (Ex parte Bank), 225 Fed., 618.

In the first of said cases all the claims urged on behalf of the customers were urged and overruled, and this court is asked to disregard the authority of thoses cases and apply to this situation the equitable ground above referred to.

It would seem that to so hold would conflict with the authorities holding that a lien may be established upon such "seat."

It must always be kept in mind that the right to create such a lien is subject to the constitution of the exchange, but if, in any event, a stock exchange creditor of a member may take the proceeds of the "seat," the lien would be of no value.

While it is true, as said in the cases above referred to, some hardships may result from the construction placed upon the constitution of the exchange, this court feels bound to follow the adjudications upon the subject, and therefore holds that the residue of the proceeds of the New York Stock Exchange seat, after discharging the lien of Mrs. Anderson, are payable to the administrator.

### COSTS AND EXPENSES.

The administration costs and expenses, including attorneys' fees, and administrator's fees for extraordinary services, are within the jurisdiction of the Probate Court.

Costs and expenses have been incurred in the cases in New York, in this action in preparing accounts of customers, in restating accounts and in other ways. By whom should these costs and expenses be paid?

The concluding remark of Mayer, J., in the *Wilson case,* Ib, p. 657, seems to be very pertinent at this time:

"Possibly when the figures are rearranged, this discussion as to contribution to expenses may prove academic."

This statement follows his opinion given on p. 656 as follows:

"These expenses should first come out of the general estate. If that is not sufficient, then they should come pro-rata out of the securities or their proceeds available to Class B claimants. If not satisfied out of Class B securities or proceeds, then the balance, if any, for this purpose, should be apportioned pro-rata among Class A claimants."

That this rule is just is clear from the considerations that it is the decedent's estate that is under course of administration— that by reason of his acts great losses will result to his customers; that what the latter are seeking is to recover what is their own; that no act of theirs brought about the condition of the estate, and that they as owners of specific pledged property are not injuring general creditors in any way by attempting to get their own property.

The court is not satisfied that the actions in New York were wrongful. Surely if the customers had the right to replevin

(McIntyre, 181 F., 959), they had the right to proceed by other appropriate remedies to recover their property.

There will have to be some adjustment of the costs of those cases, and the court will protect its own appointee (the custodian), in the performance of any duty imposed upon it, but the accounts are not in, and until they are, the court will not undertake to make any order as to the items of costs properly cognizable in this cause, except that the custodian, after delivering to those Class A customers *all of whose securities were wrongfully re-pledged,* such securities or the proceeds thereof, shall retain in his hands ten per cent of all the balance of said fund, pro-rated amongst the remaining claimants, until a final and proper order may be made as to costs and expenses, "when the figures are re-arranged."

The administrator shall also be subject to the same direction respecting securities in his hands which are claimed and identified by customers as their securities.

### HILL AND ANDERSON.

*Murray Seasongood, Robert P. Goldman, Charles H. Stephens, Jr.,* counsel for plaintiff.

*Pogue, Hoffheimer & Pogue, Ernst, Cassatt & Cottle, Dolle, Taylor, O'Donnell & Geisler, L. A. Ireton, Oscar W. Kuhn, Waite, Schindel & Bayless, Frost & Jacobs, Hunt, Bennett & Utter, Mallon & Vordenberg, Harmon, Colston, Goldsmith & Hoadly, C. B. Wilby, et al,* counsel for defendants.